NATIONAL PIGMENTS & CHEMICAL CO.
v. C. K. WILLIAMS & CO.*
No. 10996.

Circuit Court of Appeals, Eighth Circuit.
Jan. 31, 1938.

*Rehearing denied March 16, 1938.

John H. Bruninga, of St. Louis, Mo. (Robert E. Moloney, of St. Louis, Mo., on the brief), for appellant.

Nelson Littell, of New York City (Theodore Rassieur and George M. Rassieur, both of St. Louis, Mo., on the brief), for appellee.

Before STONE, GARDNER, and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

This is a suit under the Declaratory Judgment Act. Jud.Code § 274d, 28 U.S.C. A. § 400. It was commenced in equity by the appellee (hereinafter called Williams) against the appellant (hereinafter called National), seeking (1) to have determined the rights of the parties in a controversy involving two patent licensing contracts (herein referred to as contracts A and B) and (2) to secure an injunction against the appellant restraining it from suing the appellee and its subsidiaries in connection with the existing controversy.

Contract A is dated February 25, 1926, and contract B April 5, 1926. Both contracts, it is agreed, were executed on the latter date, although written at different times.

The bill of complaint averred the execution of the contracts; that appellee had observed and complied with all their terms and conditions; that the patents and licenses thereunder are of great value; and that appellee desires to retain the licenses. It was also alleged that a controversy had arisen between the appellant and the appellee with respect to the royalties to be paid under contract B; and appellee prayed (1) for a construction of both license agreements to determine whether there should be paid a royalty of $1.50 or $2.50 a ton on materials coming within contract B; (2) for a construction of contract A to determine whether any royalty is payable thereunder on iron oxide sold under contract B; (3) for an injunction restraining appellant from attempting to cancel either contract and from suing appellee or its sublicensees as infringers; and (4) for general relief.

The answer admitted the execution of the contracts, denied that appellee had observed their terms and conditions, and pleaded that appellee was not entitled to a declaratory judgment construing the contracts because they were not in existence at the time of the commencement of the suit; that both contracts had been canceled effective November 12, 1934, for certain violations of their terms specified in a notice given under date of October 12, 1934.

The cause was fully tried in the court below and a decree favorable to the appellee was entered from which the defendant appeals.

The appeal calls for a review of the findings and decree of the District Court upon two questions:

(1) Were the licensing agreements in effect at the time of the commencement of the suit, or had appellant rightfully canceled them before that time for violation of their terms by appellee and its sublicensees?

(2) If the agreements were in effect, was the appellee entitled to the full measure of relief granted in the decree?

Prior to the transactions leading to the controversy between the parties to this suit, National was the owner of the Stroud patent, No. 1,575,944, relating to mud-laden fluids used in the drilling of oil and gas wells. The patent covered the use of barytes, iron oxide, and other ingredients intended to control and increase the specific gravity of the fluid to which such ingredients were added. National also owned the Harth application, serial No. 71,855, for a patent (afterwards issued) for a process pertaining to the suspension of iron oxide,

barytes, and other ingredients in such drilling fluids.

An understanding of the scope and object of these inventions is necessary fully to appreciate the license contracts A and B and the issues presented here for determination. Before the discovery of these inventions, it had been the practice in the drilling of oil and gas wells to circulate down through the hollow drill stem and up the outside of the drill stem along the wall of the bore hole a muddy fluid consisting of water and the cuttings from the shales and clays met with in drilling. Two problems were encountered in the use of these mud-laden fluids which the Stroud and Harth patents were intended to solve: First, the weight or specific gravity of the ordinary mud was not sufficient to hold back the gas pressure and effectively to seal up the porous formations commonly passed through in drilling; second, the heavy and solid components of the fluid were not sufficiently held in suspension for practical purposes but precipitated and settled to the bottom resulting in many inconveniences.

The Stroud patent is intended to solve the first of these problems. It provides for adding to the mud-laden fluid for the purpose of increasing its density and weight (specific gravity) barytes, iron oxide, or lead oxide. The Harth patent attempts to solve the second problem. It covers the use of "a concentrated collodial suspending agent" which serves the purpose of "keeping the heavy base in suspension." The suspending agent most commonly in use is bentonite. Under this patent the bentonite is mixed with either barytes or iron oxide and the mixture is then added to the mud-laden fluid. Under this process both the specific gravity of the fluid is increased and the solids suspended and the settling prevented. In cases where from the nature of. the collodial clays through which the well is bored a weighting substance only is needed, the driller purchases either barytes or iron oxide for use with the mud. He must be supplied with one of these ingredients under the Stroud patent. But, when it is necessary not only to increase the weight of the mud-laden fluid but also to prevent settling, the driller will require a certain percentage of bentonite mixed with the iron oxide or barytes to accomplish his purpose.

Contract A is a restricted license agreement by the terms of which National granted Williams the exclusive right to sell, and to license others to sell, iron oxide only for use under the Stroud patent; and contract B grants Williams the exclusive right to use the processes and to license others to use the processes and sell the materials (chiefly bentonite) required under the Harth patent, "for use in connection with iron oxides used in drilling * * * oil and gas wells." It will be observed that Williams and its licensees are limited to the right to sell iron oxide under the Stroud patent and to the use of bentonite in combination with iron oxide under the Harth patent.

Section 20 of each contract reserves to National the right to cancel the contract by giving to Williams a 30-day written notice for failure "to carry out all of the terms and conditions" of the contract.

On October 12, 1934, National gave notice of cancellation, claiming that Williams had violated both contracts in the following particulars: (1) By failure to pay a royalty of $2.50 a ton on the mixture of iron oxide and bentonite; (2) by failure to furnish copies of sublicenses granted to Williams' subsidiaries operating under the license contracts; (3) by failure to furnish the records required under sections 3 and 10 of the contracts; (4) by failure to give notice of improvements in conformity with the provisions of section 5 of the contracts; and (5) by failure to furnish the names and addresses of parties to whom bentonite had been sold.

Williams refused to comply with any of these demands within 30 days, and National contends that both contracts are terminated. The refusal was based upon the claim either that the provisions of the contracts had been complied with or that the thing demanded was not required. A further claim of Williams is that section 20 of the contracts makes it incumbent upon National to establish by proof in court the alleged violation within the 30-day period to render the cancellation effective. The lower court found for appellee upon all these contentions.

The dispute in respect of the royalty to be paid by Williams arises out of the fact that under both contracts the compensation to be paid is measured by the number of tons of iron oxide sold or treated. Contract A provides: "In consideration of this grant, party of the Second Part (Williams) agrees to pay to the party of the First Part (National) One ($1.00) Dollar per ton on each and every ton of iron oxide sold by the party of the Second Part for use under or in connection with the above mentioned patent (Stroud). * * *"

Contract B provides: "In consideration of this grant party of the Second Part (Williams) hereby agrees to pay to party of the First Part (National) One Dollar and Fifty cents ($1.50) per ton for each and every ton of iron oxide treated with the materials mentioned in the Harth invention * * * or on each ton of iron oxide sold for use in connection with any of the processes mentioned in said Harth invention."

The contention of appellant is that, when Williams treats iron oxide with bentonite under the Harth patent and sells it, he must pay $1 a ton under contract A plus $1.50 a ton under contract B for each ton of iron oxide sold. The appellee says that when the contracts are read together they are mutually exclusive and that they require a payment of only $1.50 a ton for iron oxide used under contract B.

While the record sets out the history of the dealings of the parties from 1926 until 1934 under the contracts, both parties agree that their provisions are unambiguous, and that the point is to be settled by a proper construction of the instruments themselves. They are not rendered ambiguous by the fact that the parties do not now agree upon the proper construction to be given them. They were deliberately entered into, the language is clear, and its meaning can easily be determined from a consideration of the simple and harmonious facts with which they deal. 13 C.J. 520.

The trial court found that contract A "expressly exclude(s) the processes and methods covered by the suspension patent from operation of the first contract," and that "Nowhere in either contract is there a statement that the royalty on iron oxide mixed with bentonite should be $2.50 per ton, and the processes and methods covered by the second or suspension contract instead of being included within the first contract are specifically excluded from the operation of the first contract, Exhibit A."

With this interpretation of the contracts we agree. The first contract, A, provides as plainly as language can state it that the royalty shall be $1 a ton "on each and every ton of iron oxide sold by the party of the Second Part for use under * * * the above mentioned patent (Stroud) * * * except the suspension method (Harth) * * it being agreed that the rights under said suspension patent shall be covered by a separate contract." The right to a royalty of $1.50 a ton on iron oxide provided in contract B is therefore the only right to com-

pensation relating to royalties under the second grant.

Counsel for appellant, in support of their contention upon this point, attach significance to the word "treated" in contract B. Their claim is that this shows that it was the intention of the parties that $1 a ton should be paid for the right to sell iron oxide and $1.50 a ton in addition for treating it with bentonite. But this view is justified neither by the language of the contracts nor by their purpose. The testimony shows that iron oxide is sold to well drillers for use alone, in which case it carries a royalty of $1 a ton under contract A, and also in combination with bentonite, in which case it is subject to a royalty of $1.50 a ton under contract B.

While contract A refers to contract B, it is clear that they are independent contracts. Contract B is in no sense supplementary to contract A. It makes no reference to contract A. They grant licenses under two distinct patents. If either contract were canceled by mutual agreement or otherwise, the other might remain in full force and effect and its obligations would neither be altered nor impaired. Had the two licenses been granted to different persons, it could not be said that the holder of the license under the Harth patent would be required to pay royalties under both patents.

The plain meaning of the contracts is the same whether their execution be regarded as a single transaction or as two separate transactions. If the contracts speak simultaneously, the first one (A) says the royalty to be paid on iron oxide sold alone is $1 a ton and the second (B) adds, but if iron oxide be mixed or "treated" with bentonite, the royalty thereon must be $1.50 per ton.

Not only are these contracts unambiguous, but it is clear that the parties understood and interpreted them as independent and exclusive for a period of approximately seven years before any attempt to cancel them was made. During that time more than $20,000 in royalties were paid and received. Monthly reports of sales were made accompanied with checks for royalties under each contract separately, each check containing the statement: "The endorsement of this check acknowledges payment in full of the statement attached," or an equivalent expression. Each statement attached was a complete account of sales showing the number of tons of iron oxide sold during the preceding month, whether sold alone under the Stroud patent or in combination with

bentonite under the Harth patent, with the rate ($1 or $1.50 per ton) and amount of royalty. National, therefore, had full knowledge of the interpretation placed upon the contracts by Williams and consented thereto. It is true one of Williams' subsidiaries made two royalty payments at the rate of $2.50 a ton in 1927, but a plausible and satisfying explanation is made of those two exceptions.

The evidence sustains, also, the finding of the lower court upon the demand for copies of sublicenses. Article 8 of each contract gives Williams the right to grant sublicenses, and provides that the sublicensees shall be bound by all the terms of the contracts. Williams never handled the patented articles nor used the processes directly but operated through two wholly owned subsidiary corporations, one in Illinois and the other in California. To each of them copies of the contracts were furnished and they were instructed orally and by letters to observe their provisions. There is no substantial claim that either of them failed to operate within the terms of the contracts prior to the giving of notice of cancellation. No objection was made to the fact that they had not executed written sublicense contracts during a period of nearly eight years from 1926 to 1934. They accepted the terms of the contracts and acted under them, and were therefore bound as sublicensees. Further, the contracts do not require sublicenses to be in writing, and such a grant may be oral or in writing. Walker on Patents, vol. 1, 6th Ed., § 351, p. 429.

The charge that Williams did not furnish the records required by sections 3 and 10 is wholly unfounded. Sections 3 and 10 provide that Williams and his sublicensees shall "keep accurate accounts of all iron oxide" used or sold and furnish National copies of all reports made by all sublicensees. The evidence shows that this was done as required. The contracts do not require that the accounts be copied and furnished National, but that such accounts shall be open to inspection. The reports, copies of which were furnished, supplied complete information in regard to the number of tons of iron oxide used and sold, and National was invited to inspect the books of the companies. It cannot now complain of its own failure to take advantage of the opportunity thus afforded it.

It is next charged that Williams and its sublicensees failed to comply with section 5

of the contracts. Section 5 in each contract provides that, if either Williams or its sublicensees acquire any knowledge of any improvements in the method of handling iron oxide or in the material or processes under either the Stroud or Harth inventions, notice must immediately be given National, the improvements or discoveries fully disclosed, and all rights to such discoveries shall be the property of National, with the right of the licensee and its sublicensees to use the improvements under contract A or B as the case may be. The evidence fully supports the finding of the lower court that no improvements had been discovered at the time notice of cancellation was given on October 12, 1934. Thereafter "Gelox" was discovered, the effect of which on the rights of the parties is hereafter discussed.

Finally, it was charged in the notice of cancellation that Williams and its subsidiaries failed to furnish National with the names and addresses of the parties to whom bentonite had been sold, and demand was made that such information be furnished. It is sufficient to say in regard to this feature of the controversy that neither contract requires such details. The requirement is that accurate accounts be kept and that the correct number of tons of iron oxide sold should be reported. This was done.

As already observed, section 20 of each contract reserves to National the right to cancel either contract for failure of Williams or its sublicensees to "carry out all of the terms and conditions of this agreement." There is then added: " * * * if within said thirty (30) days the party of the First Part (National) has proven that the claimed violation has occurred and party of the Second Part shall fail to carry out the terms of this contract, * * * then all rights * * * hereunder shall cease and determine."

Williams contends that the foregoing provision makes it incumbent upon National to prove in court within the 30-day period the claimed violations in the notice of cancellation in order to render the cancellation effective. The lower court sustained this contention. In view of the failure of proof to sustain the violations alleged in the notice of October 12, 1934, it is unnecessary to decide that question for the purpose of settling the present controversy. But, since the decree in this suit is a declaratory judgment, prospective as well as retrospective in its implications, it may be regarded as res judicata as to future controversies.

Therefore the decree should be modified to correct any errors which are pointed out on this appeal.

Paragraph 8 of the decree provides:

"8. That a perpetual injunction be issued in this suit enjoining and restraining the National Pigments & Chemical Co., its officers, agents, workmen, servants, employees, and each of them, from cancelling or attempting to cancel said contracts Exhibits A and B or from charging Plaintiff, C. K. Williams & Co., or its sublicensees, Geo. S. Mepham Corporation or C. K. Williams & Co. of California, Ltd., with violation of the said license contracts Exhibits A and B or with infringement of the Letters Patent No. 1,575,944 or No. 1,991,637 *unless and until the said Defendant, National Pigments & Chemical Co., has first proven its claimed violation in a court of equity and given the Plaintiff an opportunity to carry out the terms of the contracts as construed by the Court in accordance with clause 20 of each of the license contracts Exhibits A and B."* (Italics supplied).

The court also found as a conclusion of law that, in order to effect a forfeiture of contracts, A or B appellant "must first prove its claimed violation in a court of law or equity. * * *"

We think the court was in error in so holding and decreeing. The language requiring proof of claimed violations was no doubt inserted for the purpose of protecting the licensee against arbitrary claims of violation on the part of the owner of the patents. Proof in court is not necessary to accomplish this purpose and intent of the parties. Apparently this provision was given much consideration; and, had the parties intended that a breach of contract to be effective as a ground for cancellation must first be established by proof in court, it would have been an easy matter to have said so in the contracts. It is further apparent that this clause of the contract was inserted for the benefit of Williams, and it is evident that it was worded by its representative. If, therefore, the language is to be considered ambiguous, it must be given a strict construction against Williams. Richmond v. Brandt, 118 Ill.App. 624; McManus v. Gregory, 16 Mo.App. 375, affirmed 94 Mo. 370, 7 S.W. 423; McFarlane v. York, 90 Ark. 88, 117 S.W. 773.

It was therefore improper to read into the agreements a limitation which was not expressed therein and was not required for carrying out the intention of the parties.

The last portion of paragraph 8 of the decree beginning with the words "unless and until" should be stricken; and there should be substituted in lieu thereof the words "for any of the reasons referred to in defendants' notice of cancellation contained in its letter dated October 12, 1934."

It is necessary to modify the decree in a further particular. Upon the trial in the lower court a controversy was introduced by the parties in regard to the sale of Gelox by the Geo. S. Mepham Corporation, the Illinois subsidiary and sublicensee of Williams. This controversy is not within the scope of the issues; and, if it were, the evidence does not support the findings and decree of the court in respect thereto.

Gelox is a trade-name applied to a mixture of iron oxide and bentonite under the Stinson patent. It appears that J. K. Stinson, an employee of the Mepham Corporation, made application for a patent on February 19, 1935, and the patent was issued to the corporation as assignee on June 4, 1935. The material claim to invention is for "A compound for use in a drilling mud for oil and gas wells containing 90% to 98% of bentonite in combination with 2% to 10% of iron oxide * * *" for use as a wall-building fluid.

With its remittance for royalties under date of February 9, 1935, Williams reported the sale of three tons of Gelox composed of 1 per cent. iron oxide and 99 per cent. bentonite on which a royalty of $1.50 per ton was tendered. Succeeding reports show a continued dealing in Gelox by appellee. Other reports show Gelox consisting of 2 per cent. iron oxide and 98 per cent. bentonite.

On February 23, 1935, National addressed a letter to Williams, calling its attention to the fact that National then had learned that Williams was selling Gelox to drillers and operators. In that letter National asserted that Gelox was really only bentonite and that its sale and use by Williams constituted a contributory infringement of the Harth patent, and demanded that Williams refrain from the further sale of Gelox. In Williams' reply under date of March 16, 1935, it claimed the right to sell Gelox under contract B, asserting that "we are (not) confined to any specific percentage of iron oxide" under either the Stroud or Harth patents.

Williams and its subsidiaries use the trade-name Colox to designate the patented articles sold under both license agreements

A and B. Under the Harth patent Colox, as practiced by appellee and its subsidiaries, consisted of a mixture of approximately 6 per cent. bentonite and 94 per cent. iron oxide.

The appellant claims that Gelox is not included under either contract A or B, but that its sale by Williams is prohibited. Counsel for appellant contend that the sale of Gelox not only constitutes contributory infringement of the Harth patent but that it is an unfair business practice and constitutes unfair competition. It is claimed that the sale of Gelox by Williams is a mere subterfuge to evade the payment of royalties under contract B. It is pointed out that a driller of oil and gas wells may purchase iron oxide from Williams on which a royalty of only $1 a ton is paid under the Stroud patent and then purchase Gelox from Williams containing 98 or 99 per cent. of bentonite and by mixing it with his iron oxide in the ratio 6 per cent. of Gelox (which is almost pure bentonite) to 94 per cent. of iron oxide convert it into an equivalent of Colox covered by contract B. In this way Williams will pay only $1 a ton royalty on 94 per cent. of Colox and $1.50 on only 6 per cent. Williams will thus save nearly 50 cents a ton on Colox and defraud National out of a like amount.

It is further claimed by appellant that the sale of iron oxide and bentonite (under the name of Gelox) separately results in evasion of the contracts in the particulars described, because reports of sales by Williams disclose that after Gelox was put on the market the sale of iron oxide alone increased greatly, that the sale of iron oxide mixed with bentonite under the Harth patent fell off in approximately like proportions, and that the sale of Gelox increased accordingly.

Counsel for appellee contend in this court that the Stinson patent is an improvement on the Harth patent, and that notwithstanding possibilities of infringement by the drillers the sale of Gelox is within the rights of Williams under the contracts because the Harth patent does not limit the proportions of bentonite and iron oxide to any definite percentages.

Upon these contentions the court below made findings of fact favorable to appellee, and, as a matter of law, concluded that: "Gelox, a material containing a mixture of iron oxide and bentonite, is licensed under clause 1 and clauses 4, 5 and 6 of the license contract B and the royalty thereon should

be a total of $1.50 a ton," and the decree contained a similar provision.

It is obvious that the controversy respecting the Stinson patent and the sale of Gelox is wholly outside the scope of the issues defined in the pleadings. This controversy arose at the trial regarding facts which occurred after the suit was commenced. No demand was made in the bill of complaint for a declaration of any rights under the Stinson patent, and the bill was not amended to cover the question. Neither did appellant in its answer make any reference to Gelox. The notice of cancellation of October 12, 1934, was not based on the ground that Williams was violating the contracts by the sale of Gelox. The validity of the Stinson patent was not assailed by any pleading; nor was the claim made in the answer that the sale of Gelox was prohibited by the contracts. Not only does the answer fail to raise the question, but the evidence will not support appellant's contentions made in the briefs. The Stinson patent not having been put in issue, its validity must be assumed. However, if we should assume the patent to be invalid, the alleged unfair practice of appellee in the sale of Gelox is based upon suspicion and not upon facts. If appellee is guilty of contributory infringement of the Harth patent, that fact is not shown by evidence, but we are asked to infer it from the relative amounts of iron oxide and bentonite sold by appellee after Gelox was placed on the market. In the absence of substantial proof, inference cannot be indulged. The court, therefore, erred in making findings upon the subject and in adjudging rights in connection therewith.

With respect to the entire controversy regarding Gelox and the Stinson patent, the order will be that all reference thereto shall be stricken from the decree, and that the findings and decree of the District Court shall not be considered as res judicata nor in any way prejudicial to the rights of either party in any controversy hereafter in respect thereto.

In so far as the decree determines that contracts A and B are independent and not supplementary and that the royalty to be paid on iron oxide under contract B is only $1.50 per ton, it is correct and should be affirmed. The decree must be modified, however, in the particulars pointed out herein. The injunction must be limited, also, to restrain suits for cancellation or infringement based upon any of the past events referred to in the notice of October 12, 1934. The

injunction cannot affect the rights of National in case of other violations of the contracts, if any.

The order will be that the case be remanded to the District Court, with instructions to correct the decree as indicated in this opinion; and, as so modified, the judgment appealed from is affirmed.

Modified and affirmed.