**ROSS COAL COMPANY, a corporation, Appellant,**

v.

**Albert H. COLE, Charles H. Stephens, Jr., and Louise K. Laws, Trustees of Cole & Crane Real Estate Trust, Appellees.**

**No. 7484.**

United States Court of Appeals Fourth Circuit.

Argued Oct. 21, 1957.

Decided Nov. 11, 1957.

William C. Beatty, Huntington, W. Va. (E. A. Marshall, and Fitzpatrick, Marshall, Huddleston & Bolen, Huntington, W. Va., on the brief), for appellant.

Selden S. McNeer and L. E. Woods, Jr., Huntington, W. Va. (Selden S. McNeer,

Jr., and Campbell, McNeer & Woods, Huntington, W. Va., on the brief), for appellees.

Before PARKER, Chief Judge, and SOBELOFF and HAYNSWORTH, Circuit Judges.

HAYNSWORTH, Circuit Judge.

By this action for a declaratory judgment the plaintiffs, as Trustees of Cole & Crane Real Estate Trust, sought a construction of a deed and a declaration of the rights and interests of the parties, under the deed, in the surface of certain land and in underlying coal seams. A motion for summary judgment was granted under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. upon the motion of the Trustees. Cole v. Ross Coal Company, D.C., 150 F.Supp. 808. From this order, Ross Coal Company, the defendant below, has appealed to this Court.

Prior to August 10, 1939, the West Virginia Coal & Coke Corporation was the owner in fee of a tract of land in Logan County, West Virginia, containing 217½ acres known as the Rossmore tract. The ownership of the coal had been separated from the ownership of the land and was at that time owned by the defendant Ross Coal Company. However, Ross, the owner of the coal, had leased all of the coal to the West Virginia company, the owner of the land in fee, and West Virginia was engaged in active mining operations upon the tract. In 1939 the West Virginia company was also the lessee of the coal in an adjacent tract containing 1644 acres owned in fee by the Trustees, the plaintiffs here, but whether West Virginia was then actively engaged in the removal of coal from the adjacent Cole & Crane lands is not established in the present record. It is clear that they were actively engaged in the removal of coal from the "Island Creek" seam on the Rossmore tract through a tipple located on an 18 acre section of the Rossmore tract. Both parties appear to be also in agreement that, at least at the present time, the Rossmore tract is not sufficiently large to support independent coal mining operations and that removal of any of the remaining coal on that tract is not economically feasible except as part of a larger operation on the adjacent Cole & Crane lands or other larger holdings.

On August 10, 1939, a deed was executed and delivered by which the West Virginia company released to Ross its interest as lessee in those seams of coal underlying the Island Creek seam while Ross conveyed its interest as lessor in the Island Creek and overlying seams of coal to the West Virginia company, the owner of the land. There were other parties to that deed not material to the resolution of the present controversy.

In the deed of August 10, 1939, the parties recited, among other things, that most of the coal in the Island Creek seam had been exhausted, but they recognized that coal existed both in seams overlying and in seams underlying the Island Creek seam, and that the coal in the overlying and underlying seams was mineable and marketable.

For the conversion of its interest as lessee in the nearly exhausted Island Creek seam and in the overlying seams of coal into an estate of unconditional ownership, the West Virginia company not only relinquished its interest as lessee in the seams underlying the Island Creek seam, but it also paid to Ross the sum of $33,800.00.

After delivery of the deed of August 10, 1939, the West Virginia company was the owner of the land in fee and of the underlying coal except those coal seams geologically underlying the Island Creek seam. Ownership of these lower level seams was vested in Ross and the deed provides that for the purpose of mining and producing the underlying coal seams owned by Ross, it should have certain specified surface rights subject to a provision that the rights should be so exercised as not to interfere with the coal mining operations of every kind and character then being conducted by West Virginia, or which might be thereafter conducted by West Virginia, its succes-

sors and assigns "upon said tract of land or within said Island Creek seam and within any or all other seams of coal within said tract of land which overlie said Island Creek seam of coal." The deed also provided that West Virginia would pay all taxes assessed upon the land and all of the coal except that if Ross began actual mining operations in the underlying seams owned by it, or if the West Virginia company should "permanently discontinue coal mining operations on said tract of land," then, in either of such events, Ross would pay such taxes as might be assessed upon the coal in the seams owned by it, while West Virginia would continue to pay the taxes on the land itself and upon the coal in the seams owned by it. The actual provisions of the deed, relating to the rights of Ross to the use of the surface and the tax obligations of the parties, around which this controversy is centered, are set forth in the margin.[1]

---

1. "And for the purpose of mining and producing aforesaid underlying seams of coal and each of them, said West Virginia Company, party of the third part hereto, hereby agrees, for itself, its successors and assigns, that said Ross Company, its successors and assigns, may enter said tract of 217½ acres of land within such underlying seams of coal and each of them, and mine, take and remove all of the mineable and marketable coal therein, making therein suitable and proper entries, air courses and working places to permit the convenient mining of said underlying seams of coal with other like seams of such underlying coal in adjacent or other lands, and place in such mine workings any and all suitable roads, ways, equipment, machinery and appliances suitable for the mining and production of such underlying coal and may place upon and through the surface of said 217½ acres of land, in connection with and for use in mining such underlying coal seams, bore holes for pumping of water from such underlying coal seams and from the workings in said Island Creek seam in said land; may sink air shafts through said surface and install ventilating fans thereon; may place through and upon the surface of said land travel ways and hoist ways for handling workmen and mine supplies; may erect power lines and electric substations upon the surface of said land; and may drill necessary or suitable prospecting holes in said land, without being liable for damage to the surface of said land. And said West Virginia Company, party of the third part hereto, for itself, its successors and assigns, further agrees that said Ross Company, party of the first part hereto, its successors and assigns, may take, haul and transport, free of toll, wheelage or other charge through and within mine workings that may be placed and used in such underlying coal seams in said tract of land, any and all other coal whatsoever derived from other like underlying seams. *Provided, Al-* ways, however, that the uses of aforesaid tract of land and the surface thereof, as next above provided for, shall be in such positions and of such character so that the same will not interfere with any and all coal mining operations of every kind and character now being conducted by said West Virginia Company within and upon said land and within the Island Creek seam therein or that may be hereafter conducted by said West Virginia Company, or its successors and assigns, upon said tract of land or within said Island Creek seam and within any or all other seams of coal within said tract of land which overlie said Island Creek seam of coal. And Provided, Further, that mining operations in aforesaid underlying seams of coal upon said land shall at all times be conducted, operated and maintained in such manner that the intervening natural strata between said Island Creek seam and such underlying seams of coal shall not be injured or destroyed as a proper and sufficient support for the mining of said Island Creek seam and any and all seams of coal overlying the same. And it is known, recognized and agreed by and between said Ross Company, for itself, its successors and assigns, and said West Virginia Company, for itself, its successors and assigns, that mining operations in said Island Creek seam in said tract of land have been conducted for many years and that a large part of the mine workings therein have accumulated and will accumulate large quantities of water which does not naturally drain from said workings and will not be artificially drained therefrom; and said Ross Company, party of the first part hereto, for itself, its successors and assigns. hereby covenants and agrees that it and they assume all risks whatsoever of such accumulation of water affecting or interfering with mining operations in such underlying seams in said tract of land, or mining operations in like seams in other or adjacent lands, and therefore, said Ross Company, par-

**604**

Sometime after the delivery of the deed of August 10, 1939, the West Virginia company brought to a conclusion its mining operations on the Rossmore tract and removed its tipple. So far as appears, no mining operations have since been conducted on the land.

On July 14, 1954, the West Virginia company conveyed to the Trustees all of the coal owned by it on the Rossmore tract (the remaining coal in the Island Creek seam and all of the coal in the overlying seams), the right to use the site of the former tipple for a new tipple and the right to the use of underlying strata for the mining and removal of coal owned by the Trustees, in consequence of this conveyance, within the Rossmore tract and of coal owned by them within their larger adjacent tract. By the same deed West Virginia relinquished to the Trustees its interest as lessee of the coal owned by the Trustees on the larger adjacent tract. While by this deed the Trustees became the owners of all the coal in the Rossmore tract overlying those lower seams owned by Ross, they did not become owners in fee of the surface, but the grant to them of surface and subterranean rights leaves them in the position, with respect to all matters here material, as if they had acquired ownership of the surface in fee.

This controversy arose after an effort to put together leases of coal in several adjoining tracts, including the Rossmore tract and the adjacent Cole & Crane tract. The tentative plans envisioned a tipple located on the tipple site on the Rossmore tract. The difference between the parties here was whether Ross, the owner of the deeper coal seams, or the Trustees, the owner, for practical purposes, in fee of the surface and of the shallower seams, has the paramount right to construct and operate the tipple. This is important for, under the prevailing custom and usage, if Ross has the paramount right to operate the tipple, it will be entitled to collect from the Trustees "wheelage" and other charges on coal mined on the adjoining lands of the Trustees and moved through the tipple while, if the Trustees have the paramount right to construct and operate the tipple, they would have the right to move their own coal from the adjacent lands through the tipple free of such charges.

We find it unnecessary to consider the view expressed by the District Court that Ross, in addition to those rights enumerated in the deed of August 10, 1939, with respect to its use of the surface, had the implied right to construct and operate a tipple for the removal of the coal in the deep seams

---

ty of the first part hereto, for itself, its successors and assigns, hereby waives, releases and relinquishes any and all claims whatsoever that may hereafter arise, exist or be asserted in consequence or claimed to be in consequence of the existence of such accumulation of water in said old mine workings in said Island Creek seam of coal.

"And in further consideration of the premises and the considerations moving unto said West Virginia Company by virtue of this deed, said West Virginia Company covenants and agrees, for itself, its successors and assigns, that it will continue, as hereby limited, to pay all of the tangible property taxes lawfully assessed and charged by the State of West Virginia, or by any of its subdivisions, upon said tract of land called 217½ acres and the coal seams therein. Nevertheless, this obligation shall be forever terminated upon the first occurrence of

any of the following events, that is to say:—when said Ross Company, or its successors or assigns, or any of them, undertake or begin or agree to begin the mining and production of any coal within said underlying seams, or any of them; or when said West Virginia Company, its successors or assigns, shall permanently discontinue coal mining operations on said tract of land. Upon such termination of next aforesaid obligation of said West Virginia Company, then and thereafter said Ross Company, its successors and assigns, shall pay all such aforementioned taxes that may be lawfully assessed against all or any of said underlying seams of coal and also all such taxes that may be lawfully assessed upon mining improvements and other personal property used in and about or intended to be used in and about the mining of coal in such underlying seams."

owned by it, for we think the District Court was clearly correct in concluding that, even though such an implied right existed, it would be restricted to the removal of the coal on the Rossmore tract and was limited by the provision in the deed restricting the use by Ross of the surface so as not to interfere with the mining operations of the West Virginia company, of which the Trustees are the successors. If the right to operate the tipple on the surface of the land is to be implied, it arises out of the necessity of the situation, for it is to be supposed that Ross would not have acquired or retained ownership of the coal in the deeper seams without appropriate means of removal. The same necessity does not exist and the same implication does not arise with respect to the removal of coal from adjacent lands, particularly when the coal on the adjacent lands was not owned by Ross on the date of the deed, nor was it owned by Ross at the time this controversy arose. Extending the implied right to operate a tipple for the removal of coal from adjacent lands would materially increase the burden upon the servient estate. Unless the deed, itself, provided such right, it is not to be implied. Chafin v. Gay Coal & Coke Co., 109 W.Va. 453, 156 S.E. 47.

■ We find nothing in the deed of August 10, 1939, which would justify an extension of any implied right, arising out of the necessities of the case, to the removal of coal by Ross from adjacent tracts or to permit it to impose "wheelage" and other charges as a burden upon that removal. It is true that the deed gave to Ross the right to "take, haul and transport, free of toll, wheelage or other charge through and within mine workings that may be placed and used in such underlying coal seams in said tract of land, any and all other coal whatsoever derived from other like underlying seams." But the fact that Ross was given the right to move coal through workings in the deeper seams free of any charge by the owners of the surface, does not mean that Ross has the right to

impose the burden of such charges upon the owners of the surface when they seek to move through upper workings owned by them, coal also owned by them but taken from adjacent lands.

■ Furthermore the deed of August 10, 1939, specifically provided "that the uses of aforesaid tract of land and the surface thereof (by Ross) shall be in such positions and of such character so that the same will not interfere with any and all coal mining operations of every kind and character * * * that may be hereafter conducted by said West Virginia Company, or its successors and assigns, upon said tract of land or within said Island Creek seam and within any or all other seams of coal within said tract of land which overlie said Island Creek seam of coal." This limitation upon the enumerated rights of Ross to use the surface of the land must apply to any implied rights which it has in addition to those enumerated. There would be no purpose in any limitation upon the exercise by Ross of the enumerated rights if the limitation upon them could be made wholly nugatory by the unrestricted exercise by Ross of an implied right. It is clear that Ross knew that West Virginia owned mineable and marketable coal in seams overlying the Island Creek seam on the Rossmore tract, and that it was actually operating a tipple on the only practicable tipple site on the Rossmore tract. After execution and delivery of the deed, Ross hardly could have objected if West Virginia's operations in the Island Creek seam or other overlying seams in the Rossmore Tract had lasted longer than they did, or if West Virginia extended its operations into the coal seams it controlled as lessee within the adjoining tract. With the expressed subordination of the surface rights of Ross to the mining operations of West Virginia, it is hardly to be supposed that the parties intended that Ross could so utilize the tipple site in connection with the removal of its own coal as to deprive West Virginia of the power to remove its coal. The plaintiffs are successors to, and as-

signees of, West Virginia and are entitled to do now whatever West Virginia in 1939, immediately after execution and delivery of the deed of August 10, 1939, was entitled to do.

Our construction of the deed of August 10, 1939, and our interpretation of the rights and interests of the parties may be brought into sharper focus when it is remembered that the conflicting contentions of the parties are not concerned with access to the coal owned by each, but are centered entirely around the operation of the tipple and the imposition of "wheelage" and other charges in connection with its operation. Whether or not the deed of August 10, 1939, may be said to be ambiguous in other respects, we do not think it susceptible of the construction that the restricted rights of the owner of subterranean coal to the use of the surface are paramount or superior to those of the owner of the surface and other subterranean coal when the conflict is entirely concerned with operations on the surface and within coal seams owned by the owner of the surface.

Even though we assume that under the contemplated plan all of the coal was to be taken from adjoining tracts of land, its haulage and movement through workings and shafts on the Rossmore tract and its processing and handling through a tipple on that tract would clearly appear to be a "mining operation" within the meaning of that language of the deed which prevents interference by Ross with "mining operations of every kind and character * * * that may be hereafter conducted by said West Virginia Company, or its successors and assigns, upon said tract of land * * *."

On the motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the inquiry is to the existence of any issue of fact to be tried. Stevens v. Howard D. Johnson Co., 4 Cir., 181 F.2d 390; Dale v. Preg, 9 Cir., 204 F.2d 434. If the deed was ambiguous with respect to the rights of the parties in the area of their present conflict, and the ambiguity might be clarified by taking testimony of extraneous facts bearing upon the proper construction of the deed, summary judgment would be inappropriate. Having found, however, that the deed is not reasonably susceptible to an interpretation which would give Ross the paramount right to operate the tipple, there is no need of further inquiry and there is no issue of fact to be tried. The disposition of the matter by summary judgment was entirely appropriate and correct. United States v. Northern Pacific Railway Co., 8 Cir., 188 F.2d 277; Jackson v. Texas Company, 10 Cir., 75 F.2d 549; National Pigments & Chemical Co. v. C. K. Williams & Co., 8 Cir., 94 F.2d 792.

Should we assume, however, that the deed of August 10, 1939, was ambiguous with reference to the rights of the parties in the area of their present conflict, it was incumbent upon Ross to point out the issues of fact, the resolution of which would aid the Court in the interpretation of the deed. Zoby v. American Fidelity Co., 4 Cir., 242 F.2d 76; Hoffman v. Partridge, 84 U.S.App. D.C. 224, 172 F.2d 275; Engl v. Aetna Life Insurance Co., 2 Cir., 139 F.2d 469. Ross undertook to do that and pointed to two issues upon which it felt testimony should be taken.

The first of the issues suggested by Ross was the question as to whether or not on August 10, 1939, the date of the deed in question, West Virginia's coal mining operations were confined to that portion of the Island Creek seam which lies entirely within the Rossmore tract or whether it extended into that seam within the Cole & Crane tract, of which coal West Virginia was the lessee. What the situation with respect to that matter was in 1939 is not established by the present record, but though we assume that the coal faces worked by West Virginia on August 10, 1939, were all within the Rossmore tract, it does not aid Ross in its contention as to the proper construction of the deed. The limitation upon the rights of Ross to use the surface so as not to interfere with

the operations of West Virginia is not restricted to those specific operations then being conducted by West Virginia, but are expressly extended to those operations of every kind and character which might thereafter be conducted by West Virginia, its successors and assigns. Whether or not West Virginia was then engaged in removing coal from the adjacent land, of which it was the lessee, it is not to be supposed that it intended to foreclose its right to remove such coal through the tipple on the Rossmore tract free from interference by Ross. If it be objected that the provision might enable West Virginia to postpone indefinitely the unfettered enjoyment by Ross of its surface rights, the answer is that Ross should have restricted its covenant not to interfere with those operations then being conducted by West Virginia. This it did not do, but expressly agreed not to interfere with any subsequent mining operation of any kind or character.

We are mindful that the factual inquiry proposed by Ross is a comparison of the contemplated mining operations with the active operations of West Virginia in 1939, and we decide no more than the irrelevancy of that inquiry. If the facts had warranted, and Ross had suggested as essential, an inquiry into the scope of the contemplated mining operations as compared to the scope of West Virginia's probable operations, viewed prior to August 10, 1939, in the light of its then existing interests in the coal in neighboring lands, a different question would have been presented. The contemplated operations are concerned primarily, or solely, with operations in the No. 2 Gas seam, which underlies the Island Creek seam, but, as to the Cole & Crane lands, that seam was controlled by West Virginia in 1939 and is wholly owned by the Trustees now. The deed of August 10, 1939, extinguished the rights of West Virginia in the No. 2 Gas seam on the Rossmore tract but did nothing to circumscribe the rights of West Virginia, or the scope of its foreseeable operations, in that seam in its larger holdings, as lessee, on the Cole & Crane lands. Unless, in the language of the deed, we can find some clear restriction upon its right to expand its then existing operations into other coal seams then owned by it, which we cannot, expansion into the No. 2 Gas seam on the Cole & Crane lands is not foreclosed by the language of the deed.

The second factual issue upon which Ross claims testimony should be taken arises out of that provision of the deed defining the obligations of the parties with respect to the payment of ad valorem taxes. The deed provided that West Virginia was to pay all of such taxes until Ross began active mining operations in the lower level seams of coal owned by it or until West Virginia permanently abandoned its mining operations on the Rossmore tract. In either of those events, Ross was to assume responsibility for the payment of all such taxes assessed upon those seams of coal owned by it while West Virginia was to continue to be responsible for all such taxes assessed upon the surface and upon all of the coal in those seams owned by West Virginia. The record discloses that sometime after August 10, 1939, West Virginia ceased active operations upon the Rossmore tract and dismantled and removed its tipple, without, however, exhausting the coal in the seams it owned. But, again, if we assume that West Virginia then called upon Ross to pay taxes upon coal owned by Ross, it still does not aid Ross in its position as to the proper interpretation of the deed. The provision for the distribution of tax obligations was entirely independent of the provisions of the deed granting, and restricting, rights to Ross to the use of the surface. Nor is it to be supposed that, having carefully protected all operations West Virginia, or its successors, might conduct in the future from interference by Ross, it was contemplated that all of such rights would be entirely abandoned and extinguished simply because it may have called upon Ross to pay those taxes assessed against Ross' coal, while West

Virginia continued to pay those taxes assessed against its coal and upon the surface. It may well be that the resumption of operations by the Trustees, the successors and assigns of West Virginia, upon the Rossmore tract would relieve Ross of its obligation to pay accruing taxes upon the coal owned by Ross, but whatever taxes may have been paid by Ross in the past upon demand, or with the acquiescence, of West Virginia, can hardly be held under the terms of this deed to have extinguished all of the rights which West Virginia was so careful to protect and preserve for itself.

It thus appears that there was no issue of fact to be tried, that the deed of August 10, 1939, was properly construed by the District Court, and that it properly granted the motion of the Trustees for summary judgment.

Affirmed.