# CHARLESTON.

## HAIGH *v.* BELL.

Submitted June 10, 1895—Decided November 13, 1895.

1. POLICE POWER—HOGS.
    An act making it unlawful for the owner of hogs to permit them to run at large is an exercise of the police power.

2. POLICE POWER—COUNTY COURTS.
    The county court is the police court of the county, and to it the legislature may specially delegate the exercise of such power in specified cases.

3. POLICE POWER—CONSTITUTIONAL LAW.

   The act of the legislature approved 1st April, 1873 (see Acts 1872-3, p. 175) does not violate any constitutional right of the citizen, or contravene any requirement of such organic law.

   A case in which these principles are applied.

GEO. C. STURGISS and JOSEPH MORELAND for plaintiff in error, cited Const. Arts. VI, VII, VIII; Id. Art. III, s. 10; Id. Art. V, s. 1; Id. Art. VI, s. 39; Id. Art. VIII, s. 1; Acts 1872-3, c. 77; Acts 1885, c. 45; Locke, Civ. Gov. § 142; 18 Am. Rep. 334; 23 Am. Rep 424; 8 W. Va. 720, 730-31-32-33-34; 9 W. Va. 253, 270; 17 W. Va. 216; 26 W. Va. 62; 38 W. Va. 125, 130.

L. V. KECK for defendant in error, cited Acts 1872-3, c. 143, s. 3; Id. c. 77, s. 1; Id. c. 148, s. 3; Acts 1882, c. 115, s. 3; Acts 1883, c. 32; Acts 1885, c. 45, s. 1; Potter's Dw. Stats. & Consts. 52, 53; 154-5 (notes 4, 5); Bent's Dig. 603-4-5; Code p. 593, s. 3a; Pref. to Warth's Code (2nd Ed); 7 W. Va. 114, 115 136, 142; 1 Black (U. S.) 470; 9 Barb. 308; 16 Pet. 342; 8 Cranch, 109; 21 Pa. 37; 6 Watts & Serg. 209; 5 Hill, 221; 2 Barb. 316; 1 Hilt. 271.

HOLT, PRESIDENT :

An action of trespass before a justice of Monongalia county, taken by *certiorari* to the Circuit Court, judgment of the justice set aside, cause retained and tried *de novo*, and brought here by defendant, Bell, on the ground of involving the constitutionality of the law on which the action is founded.

Chapter 77 of the Acts of 1872-3, p. 175, provides (section 1) that it shall be unlawful for owners to permit their hogs to run at large in the county of Harrison; giving the owner of the property injured by hogs running at large double damages, and a lien on the hogs for the payment thereof, and the right to distrain, and, after notice, to sell, *etc.,* as could be done at common-law.

The clause here brought in question is the following: "The provisions of this act shall extend to all the counties in the state, provided, that the county court may upon the pe-

tition of one hundred voters of the county direct to have the same enforced in their said county or in any district or districts thereof." On the 11th day of November, 1881, the County Court of Monongalia county, upon the petition of one hundred voters of the county, by order entered of record, directed that the provisions of chapter 77 of the act of 1st April, 1873, should be enforced in Clinton district, of said county. On the 27th day of February, 1885, taking effect 2nd March, the general law on the subject was passed as we now find it in Code, 1891, p. 593, c. 60, s. 3*a et seq.* Is this law unconstitutional? That is the only question.

In every case where one man has a right to exclude another from his land, the common-law encircles it, if not inclosed already, with an imaginary fence. Doct. & Stud. dialogue 1, p. 30, c. 8. And to break such imaginary fence, and enter the close of another, is a trespass, giving rise to the action of *trespass quare clausum fregit.* And the man is answerable for not only his own trespass, but for that of his cattle also; for if, by his negligent keeping, they stray upon the land of another—and much more if he permits or drives them—and they then tread down his neighbor's herbage and spoil his corn or trees, this is a trespass for which the owner must answer in damages. And the law gives the party injured a double remedy in this case, by permitting him to distrain the cattle thus damage feasant (doing damage) till the owner shall make him satisfaction, or else, by leaving him to the common remedy in *foro contensioso,* by action. 3 Bl. Comm. 211. See *Holladay* v. *Marsh* (1829) 3 Wend. 142. All chattels trespassing on land may be distrained damage feasant. 3 Com. Dig. 478. Blackstone uses the term "cattle" as a general one, comprehending sheep, oxen, swine and horses. 1 Bl. Comm. 298. It may comprehend any live stock kept for use or profit; animals useful for food or labor. And. Law. Dict. p. 155. The rule does not apply to damage done by cattle straying off a highway on which they are being lawfully driven. In such case the owner is liable only on proof of negligence. See Pol. Torts 405. Cattle trespass is an old and well settled head—perhaps the oldest. It is the nature of cattle and other live stock to stray, if not

kept in, and to do damage if they stray; and the owner is bound to keep them from straying at his peril. *Id.* 404. In brief, the common-law doctrine is that the owner of cattle must fence them in. He is not compelled to fence the cattle of others out. His imaginary close does that. Owing to change of circumstances, and the inadaptability due in part to the settling of new country, in this state a different rule prevails. The owner of land must fence out the cattle of others. He need not fence in his own. He takes the risk of loss of them, or injury to them, from their running at large or wandering into danger. *Blaine* v. *Railway Co.* (1876) 9 W. Va. 252; *Baylor* v. *Railroad Co., Id.* 270. The common-law doctrine rests on public expediency, and was anciently guarded by strict rules. The converse in this state rests on the same foundation, and is now regulated by statute. The right of the possessor of land to distrain cattle doing damage there is placed by Blackstone among the class of private injuries redressed by the mere act of the parties: (1) Defense of oneself; (2) recapture or reprisal; (3) entry on lands and tenements; (4) abatement of nuisances; (5) the law allows a man to be his own avenger, or to administer redress to himself by distraining another's cattle doing damage or trespassing upon his land. 3 Bl.Comm. p. 9, § 2; Pol. & M. Hist. Eng. Law 572. The object of the common-law was threefold: (1) To put a stop to further damage without injury to the cattle damage feasant, for the thing distrained must not be used, injured, or destroyed; (2) to enable the owner of the land to identify the cattle, and ascertain the owner of them, for they must be taken in the very act; (3) to give a lien upon the cattle for the damage done, and the expenses incurred in putting a stop to its continuance, which is confined to the damage done at one time.

The law in question was introduced by the late Judge G. D. Camden, then the member of the state senate from the county of Harrison—a thickly settled farming country, which desired the passage of such a law. The object was to restore, by way of police regulation, the common-law doctrine of the close, and of distress damage feasant, so far as

it related to the one species of live stock mentioned—so annoying, destructive and difficult to fence out, especially while young and small. The propriety and necessity of a certain class of police regulations depend upon time, place and circumstances. What is required in one district or town may not be in another. Here the court is given the power to exercise their discretion. They may or may not, as in their wisdom they may see fit, by order entered of record on petition of one hundred voters of the county, direct this police regulation to apply to and be enforced in their respective counties, or in any district thereof. In this case it was made to apply to the thickly settled farming river district of Clinton, and where it was needed, as we are to presume.

It is said that this law is unconstitutional, and therefore void, because it seeks to deprive the owner of the hogs of his property without due process of law. Constitution W. Va., Article III, s. 10: "No person shall be deprived of life, liberty or property without due process of law and the judgment of his peers." In *Jelley* v. *Dils*, 27 W. Va. 267, 275, it is said the word "and," as here used, must be interpreted to mean "or." As to the reading of Magna Charta. See 1 Pol. & M. Hist. Eng. Law, p. 15; 2 Bl. Law Tracts, p. 42. It is said that this act is unconstitutional in two ways: *First,* it assumes or seeks to confer power not legislative; *second,* because it violates this specific provision of both state and federal constitutions; citing *Hanson* v. *Vernon,* 27 Iowa 28. See, also, *Stewart* v. *Board of Sup'rs,* 30 Iowa 9, and cases cited.

The first volume of Blackstone's Commentaries was published 2d November, 1765—at a time when the thirteen American colonies were just beginning to have a sense of their essential unity and of the need of a common law. 1 Bl. Comm. (Pref. of Ed. by Dr. Hammond) p. 7. An American edition was published in Philadelphia in 1771-72. So that at the time they were drawing up and adopting the state constitutions and the federal constitution, with their bills of rights, Blackstone's Commentaries was received and read as the one great book of the common-law in all questions of

private right. Coming as it did at such aconjuncture of af-
fairs—such a combination of legal and political circumstan-
ces—it was received then, and for that reason, apart from
its intrinsic merits, has continued to be received since, in a
general way, as the common-law of 1776, and has, as such,
been cited and quoted in American decisions to be num-
bered by the thousands. See Dr. Hammond's Edition of
Blackstone, *passim.* From that day to this, so far as I
know, it has not been held that the doctrine of self-help in
preventing wrong to persons or property, as Blackstone lays
it down, contravenes any of the constitutional guaranties
of those fundamental private rights which are all contained
in Magna Charta. So held by this Court in *Burdett* v. *Allen,*
35 W. Va. 347 (13 S. E. Rep. 1012). The common-law of self-
defense, defense of family, and of house and home, stands
as it did six hundred years ago. When this enactment is as-
sailed on the ground that it deprives the owner of his prop-
erty without due process of law, these constitutional guar-
anties, state and federal, must be considered in connection
with the police power of the state; for it is settled beyond
further judicial controversy that these inhibitions do not
limit, and were not designed to limit, the subjects upon
which the police power of the state may be exerted. *Barbier*
v. *Connelly,* 113 U. S. 27 (5 Sup. Ct. 641); *Railway Co.* v. *Beck-
with,* 129 U. S. 29 (9 Sup. Ct. 207); *Mugler* v. *Kansas,* 123 U. S.
663 (8 Sup. Ct. 273). On the other hand, it is equally certain
that the legislature can not, by assuming to exercise the
police power, act upon subjects which do not and can not
fall within its dominion, nor impose restrictions or create
or enforce discriminations which are not in the legitimate ex-
ercise of that power, and that while the judgment of the leg-
islature is accepted upon doubtful subjects, yet the courts
must in others overrule it, and refuse to sustain, as exerci-
ses of the police power, enactments not sanctioned by it.
See *State* v. *Goodwill,* 33 W. Va. 179 (10 S. E. Rep. 285); 25
Am. St. Rep. 863, note p. 882; *Com.* v. *Vrooman,* 164 Pa. St.
306 (30 Atl. 217); Black. Const. Lim. § 64. For full discus-
sion, see 4 Thomp. Corp. § 5470. However, it is much eas-
ier to perceive and realize the existence and sources (and

necessity) of this power, than to mark its boundaries or pre-
scribe a limit to its exercise. See *Com.* v. *Alger,* 7 Cush. 87;
Cooley, Const. Lim. 572. Still it is universally recognized
that its exercise may result as a necessary inference from
the existence and due protection of these rights themselves;
for, if they are the inviolable rights of the one, so they are
of the other. Hence each must so use his own as not to in-
jure those of the other. This law does not take away or
limit any such right beyond what is necessary for the pub-
lic welfare, and for the protection of the same rights of
others. It only imposes such restraint in the given case as
prevents their exercise from being injurious to the similar,
equal rights of his neighbors. Such restraint is just. The
public welfare may require it, the legislature has power
to impose it, and the county court power to exercise it,
when thus delegated to it. There are some police regula-
tions which the public welfare may require in one town or
district or county which would be ill-timed, out of place,
and therefore inconvenient, in another. Hence, this law
provides that the county court may or may not, as they, in
their judgment, may think best and see fit, upon the peti-
tion of one hundred voters of the county (the annoyance of
three or more may constitute a public nuisance) by order en-
tered of record (as was done here) direct that the law against
permitting hogs to run at large shall apply to, and be of
force in, their respective counties, or in any district or dis-
tricts thereof; and, as we must presume, the thickly set-
tled district of Clinton needed such a regulation. Notwith-
standing this, the law was general, and applied to every
county and district in the state—as much so as to the county
of Harrison. It is said that in every state the keeping of
live stock is under police regulation. Tied. Lim. p. 506, §
141. I have never heard it questioned that towns can exer-
cise such police power delegated by the legislature. Why
not the county court, which has been the police court of the
county, continuously, for more than one hundred years?
On this subject see *Hellen* v. *Noe,* 3 Ired. 493; *Whitfield* v.
*Longest,* 6 Ired. 271; *Tourne* v. *Lee,* 8 Mart. (N. S.) 548; *Roberts*

v. *Ogle*, 30 Ill. 459; 1 Am. & Eng. Enc. Law (New. Ed.) 90, 91, note.

The institution of the county court originated as early as 1623-24; and as it is the most ancient, so it has ever been one of the most important, of our institutions—for a long time, in respect to the administration of justice, and always in matters of county policy and economy. As early as 1645 they had matured into courts of general jurisdiction in law and in equity, and the most important duties in matters of police and economy were confided to them. Prior to 1661-62 the judges of the county courts were styled "commissioners of the monthly courts," and afterwards "commissioners of the county courts;" but by that act they were required to take the oath of a justice of the peace, and be called "justices of the peace." These tribunals now assumed a perfectly regular form, and their functions have ever since been so important that their institution was considered as a part of the constitution, both of the colonial and state governments. No material change was introduced by the Revolution in their jurisdiction, or in their general powers or duties, of any kind. Now, the members who compose it are no longer justices, but have come back to their old name of "commissioners of the county court," which, though shorn of general judicial power, still have the superintendence and administration of the internal and fiscal affairs of their counties. See Code 1819, p. 244, note; Const. W. Va. art. VIII, s. 24; Code, 1891, pp. 41, 42.

The county here in question (one of the successors of the memorable district and county of West Augusta, one of the oldest in time of formation, and one of the largest in territory comprehended) was created in October, 1776, holding its first county court, we may suppose, on the second Monday in December, 1776, extended by subsequent act to include part of the county of Augusta, and, thus extended, reached from the Pennsylvania state line, southward forty miles or more, into the watershed of the Great Kanawha river; and its county court has exercised police power from that day to this without question. The successive formation of new counties has very much curtailed the territorial jurisdiction

of the court, but its power in matters of police remains the same—without any material modification. See Willey, Hist. Monongalia Co., p. 47 *et passim*; Lewis Hist. W. Va. 506; 9 Hen. St. pp. 262, 420; 10 Hen. St. pp. 114, 351; 11 Hen. St. p. 366.

It may be that the legislature, by the act of 1885, now found in the Code of 1891, intending to review the legislation on this subject, covered the whole ground, making a full and complete provision touching the subject common to both, and thereby superseded this one by absorption. See *State* v. *Mines*, 38 W. Va. 125-130 (18 S. E. Rep. 470). But, so far as that question has any bearing, it is, in such case as this, a question not for this Court, but for the Circuit Court, to decide, without the right of appeal.

We have endeavored to show that the statute complained of is not unconstitutional, and therefore the writ of error must be dismissed.