IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

_____

No. 17-0968

_____

EQT PRODUCTION COMPANY,
Petitioner, Defendant Below

**FILED**

**June 5, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

v.

MARGOT BETH CROWDER and
DAVID WENTZ,
Respondents, Plaintiffs Below

_____

Appeal from the Circuit Court of Doddridge County
The Honorable Timothy L. Sweeney, Judge
Civil Action No. 14-C-64

AFFIRMED

_____

Submitted: March 12, 2019
Filed: June 5, 2019

Nicolle R. Snyder Bagnell, Esq.
Lucas Liben, Esq.
Reed Smith LLP
Pittsburgh, Pennsylvania
Counsel for the Petitioner
EQT Production Company

David L. Grubb, Esq.
Kristina Thomas Whiteaker, Esq.
The Grubb Law Group
Charleston, West Virginia
David McMahon, Esq.
Charleston, West Virginia
Counsel for the Respondents Margot Beth
Crowder and David Wentz

George A. Patterson, III, Esq.
Evan G. Conard, Esq.
Bowles Rice LLP
Charleston, West Virginia
Counsel for *Amicus Curiae*
Independent Oil and Gas Association of
West Virginia, Inc.

John F. McCuskey, Esq.
Marc F. Mignault, Esq.
Shuman, McCuskey & Slicer, PLLC
Charleston, West Virginia
Counsel for *Amicus Curiae*
West Virginia Farm Bureau

Bradley Ward Stephens, Esq.
Morgantown, West Virginia
Counsel for *Amicus Curiae*
West Virginia Surface Owner's Rights
Organization

JUSTICE HUTCHISON delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1. "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

2. "Generally, findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo*. However, ostensible findings of fact, which entail the application of law or constitute legal judgments which transcend ordinary factual determinations, must be reviewed *de novo*." Syl. Pt. 1, in part, *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 470 S.E.2d 162 (1996).

3. "An encroachment by one person on the land of another is a trespass, although the damage may be negligible." Syl. Pt. 2, *Hark v. Mountain Fork Lumber Co.*, 127 W.Va. 586, 34 S.E.2d 348 (1945).

4. "The owner of the mineral underlying land possesses as incident to this ownership the right to use the surface in such manner and with such means as would be fairly necessary for the enjoyment of the mineral estate." Syl. Pt. 1, *Squires v. Lafferty*, 95 W.Va. 307, 121 S.E. 90 (1924).

5. A mineral owner or lessee has an implied right to use the surface of a tract in any way reasonable and necessary to the development of minerals underlying the tract. However, a mineral owner or lessee does not have the right to use the surface to benefit mining or drilling operations on other lands, in the absence of an express agreement with the surface owner permitting those operations.

i

**HUTCHISON, Justice**:

Plaintiffs Margot Beth Crowder and David Wentz own the surface of land in Doddridge County, West Virginia. Defendant EQT Production Company ("EQT") holds a century-old lease that allows EQT to drill wells to extract oil and gas from beneath the plaintiffs' surface estate. The plaintiffs brought this lawsuit to challenge EQT's use of their surface estate to drill horizontal wells that extend under neighboring properties so that EQT can extract natural gas from beneath those properties. The plaintiffs contend that EQT's lease does not allow it to use their surface estate to extract oil and gas from neighboring mineral estates. Hence, the plaintiffs assert EQT is trespassing on their surface tracts, to the extent it is drilling for and removing minerals from neighboring properties.

The Circuit Court of Doddridge County agreed with the plaintiffs and entered an order granting partial summary judgment, finding EQT trespassed to the extent it used the plaintiffs' surface lands to conduct operations under neighboring mineral estates. A jury subsequently awarded the plaintiffs $190,000.00 in damages. EQT appeals the circuit court's partial summary judgment order and the jury's damage award.

For the reasons set forth below, we affirm the circuit court's order and the jury's award of damages.[1]

---

[1] We are grateful to have received *amicus curiae* briefs from the Independent Oil and Gas Association of West Virginia, the West Virginia Surface Owner's Rights Organization, and the West Virginia Farm Bureau. These well-written briefs, combined

1

## I. Factual and Procedural Background

Ownership of the plaintiffs' surface tracts traces back to Joseph L. and Bell Carr who, in 1901, owned a 351-acre tract in Doddridge County, West Virginia. The Carrs owned the "Carr Tract" in fee, *ad coelum*.[2] "The common law rule . . . is that a land owner with a fee simple title owns everything over the land and under it to the center of the earth. This rule extends to the minerals, be they solid (like coal), fluid or fugacious minerals (like oil and gas)." *Faith United Methodist Church & Cemetery of Terra Alta v. Morgan*, 231 W.Va. 423, 429-30, 745 S.E.2d 461, 467-68 (2013).

In August 1901, the Carrs leased the 351 acres of oil and gas below the Carr Tract to the predecessors of EQT. The lease agreement states that EQT's predecessor had a lease "for the sole and only purpose of mining and operating for oil and gas, and of laying pipe lines and building tanks, stations and structures thereon, to take care of said products[.]" The lease was to last "as long thereafter as oil or gas . . . is produced therefrom[.]" The parties agree that this lease remains in effect today.

---

with the excellent briefs and advocacy of the parties, greatly assisted the Court in resolving the questions presented.

[2] The "*ad coelum*" doctrine comes from the Latin phrase *cujus est solum ejus est usque ad coelum et ad inferos*, which translated means, "to whomever the soil belongs owns also to the sky and to the depths" or "for whoever owns the soil, it is theirs up to Heaven and down to Hell." Danielle Quinn, *A Fracking Fragile Issue: Courts Continue to Tiptoe around Subsurface Trespass Claims*, 27 Villanova Env.L.J. 1, 6 (2016). *See Drummond v. White Oak Fuel Co.*, 104 W.Va. 368, 375, 140 S.E. 57, 59 (1927) (applying the *ad coelum* maxim); *Dolan v. Dolan*, 70 W.Va. 76, 79, 73 S.E. 90, 91 (1911) (same).

2

Until 1936, the Carrs and their successors in title owned the entire 351-acre tract in fee (subject, of course, to the 1901 oil and gas lease). Then, the owner of the Carr Tract decided to split the surface from the mineral estate beneath the tract.[3] In November 1936, the then-owner of the Carr Tract, R.L. McCulty, conveyed to Grace Lowther "the surface only" of the Carr Tract.[4] Mr. McCulty retained the right to the oil and gas royalties from the 1901 lease, as well as sole ownership of any other minerals beneath the surface.

By the mid-1970s, Grace Lowther and her successors had partitioned the surface of the Carr Tract into several smaller parcels. In 1975, one of these parcels, within the boundaries of the original Carr Tract, was conveyed to the plaintiffs (Mr. Wentz and

---

[3] It has long been the law that a property owner may carve a fee-simple estate into smaller estates:

> The owner of a fee simple title may sever the land into separate surface and mineral estates in a number of ways. The owner may convey to another ownership in a particular mineral underlying the tract (such as all of the coal, oil, gas, uranium, silver, or limestone), a seam of one mineral, or all of the minerals, while retaining the surface of the tract. Or, the owner may convey the surface only; a conveyance of the "surface only" in effect reserves all the remaining minerals to the grantor. The separate estates that are created may later be conveyed, devised, and/or taxed.

*Faith United Methodist*, 231 W.Va. at 430, 745 S.E.2d at 468 (footnotes omitted).

[4] It appears that by 1936, the Doddridge County Bank took ownership of the 351-acre tract. The bank failed and its receiver conveyed the entire tract to two individuals: A.B. Lowther and R.L. McCulty. On November 28, 1936, Mr. Lowther conveyed his interest to Mr. McCulty. Two days later, Mr. McCulty conveyed "the surface only" of the tract to Mr. Lowther's wife, Grace. Mr. McCulty thereafter retained all rights to the minerals beneath the 351-acre tract.

Ms. Crowder).  The plaintiffs, who were married, constructed a home on their parcel built from timber cut on the land, and moved into the home in April of 1977.

In 2003, the plaintiffs divorced.  By several deeds, the plaintiffs partitioned their surface estate between themselves.  Mr. Wentz now owns two parcels and Ms. Crowder owns one parcel.  All three surface parcels are within the bounds of the 351-acre Carr Tract.  Both plaintiffs live in homes on the surface tracts at issue.

Between 1901 and 1936, and under the 1901 oil and gas lease, EQT's predecessors drilled three conventional vertical wells on the surface of the 351-acre tract.[5] These vertical wells were designed to pull oil and gas from the rock strata beneath the 351-acre Carr Tract.  After the surface estate was severed from the mineral estate in 1936, EQT's predecessors drilled six more conventional vertical wells on the Carr Tract, with the last being drilled in 1995.

By 2011, Patty J. and R. Keith Crihfield owned the mineral estate beneath the Carr Tract, an estate that included the right to royalties from the 1901 oil and gas lease. Defendant EQT owned the right to drill and operate under the 1901 lease and approached the Crihfields seeking to modify the lease.  On March 11, 2011, the Crihfields signed an "Amendment of Ratification of Oil and Gas Lease" that allowed EQT to pool and/or unitize

---

[5] The record indicates that the wells – drilled in 1910, 1912, and 1916 – produced both methane natural gas as well as oil, "drip gasoline," and other hydrocarbons. Hence, they are referred to as "oil and gas wells."

and combine the rights provided by the 1901 lease with other leases to drill and extract oil and gas under neighboring lands.[6]

EQT then sought permits to drill modern, horizontal Marcellus shale gas wells on the plaintiffs' surface lands. EQT designed the wells to extract gas from a total area of 3,232 acres, not just the 351 acres beneath the Carr Tract. Modern technology allowed EQT to initially drill vertically on the plaintiffs' surface lands, but then curve the head of the drill and extend the bore of the well horizontally thousands of feet beyond the Carr Tract and through mineral estates under neighboring properties.[7]

In mid-2012, the plaintiffs learned of EQT's plans to use their surface lands to extract gas from beneath neighboring properties. On June 18, 2012, a lawyer for the plaintiffs mailed a letter to EQT stating that EQT had rights to use the plaintiffs' surface lands only "as are reasonably necessary to extract the severed minerals from beneath the Carr tract." The plaintiffs' lawyer further advised EQT that it did "not have the right to burden, damage and otherwise occupy the Crowder/Wentz property for the purpose of extracting minerals from other mineral tracts." Finally, the plaintiffs' lawyer told EQT that

---

[6] The goal of unitization "is to consolidate enough of the interests in a particular reservoir to allow production to be carried out in the most efficient manner[.]" *Gastar Expl., Inc. v. Contraguerro*, 239 W.Va. 305, 307 n.1, 800 S.E.2d 891, 893 n.1 (2017) (quoting James E. McDaniel, *Statutory Pooling and Unitization in West Virginia: The Case for Protecting Private Landowners*, 118 W.Va. L. Rev. 439, 455 (2015)).

[7] The *amicus* brief from the Surface Rights Owner's Organization quotes an EQT statement that, in 2018, EQT's Marcellus shale wells would have "an average lateral length of 11,800 feet" – a distance of more than two miles from the well pad.

5

it did not have lease rights or the plaintiffs' permission to enter their surface lands, and warned EQT: "Do not enter the Crowder/Wentz property for oil and gas operations." EQT ignored this letter.

In February 2013, EQT entered onto the plaintiffs' surface parcels (and adjacent parcels in the Carr Tract), built various two-lane roads, and cleared about forty-two acres. EQT also constructed a 19.7-acre well pad. After sixteen months of work, by June 2014, EQT had drilled nine new wells on the plaintiffs' land, and had drilled some 9.7 miles (51,470 feet) of horizontal bores under neighboring properties. EQT claims that 37.5% of the horizontal bores were in the minerals beneath the Carr Tract, and the remaining 62.5% extended into minerals beneath neighboring tracts.[8]

The plaintiffs filed this lawsuit against EQT on November 26, 2014, and alleged that EQT had trespassed on their surface lands. The plaintiffs acknowledged that EQT had the right to enter and reasonably use their land under the 1901 lease, but only to extract gas from the mineral estate beneath their surface lands.[9] Specifically, the plaintiffs

_____

[8] One of the nine wells was permitted to have an 8,450 foot horizontal bore. The circuit court also noted that drilling one horizontal well required 10,900,000 gallons of water, all of which EQT trucked to the site. In total, drilling all nine wells required some 95,000,000 gallons of water. Additionally, the court noted that drilling the last four conventional vertical wells on the Carr Tract required a total of 305,000 pounds of sand; EQT trucked in 1,852,811 pounds of sand to drill the nine horizontal wells.

[9] The plaintiffs also admitted that, under the "rule of capture," EQT could use their surface lands to extract gas that migrates naturally into the mineral tract beneath their land. The common law doctrine of capture has been defined thusly:

6

contended that, "EQT did not have the right to enter on, burden, damage, or otherwise occupy Plaintiffs' surface lands at all for the purpose of extracting minerals from other, neighboring mineral tracts."[10]

Following discovery, the plaintiffs made a motion for partial summary judgment. The plaintiffs asserted that there was no genuine issue of material fact that EQT had trespassed on their surface lands to not only drill into the mineral strata underlying their lands, "but to drill into, frac, produce and transport gas from neighboring mineral tracts."

Defendant EQT responded with its own motion for summary judgment. EQT argued that because (1) about 37.5% of the horizontal wellbore was through gas-bearing shale beneath the Carr Tract, and (2) the 1901 Carr oil and gas lease was unitized in 2011

---

[Oil and gas] belong to the owner of the land, and are part of it, so long as they are on it or in it or subject to his control; but when they escape and go into other land, or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land, and taps a deposit of oil or gas, extending under his neighbor's field, so that it comes into his well, it becomes his property.

*Brown v. Spilman*, 155 U.S. 665, 670 (1895). *See generally*, *Gain v. S. Penn Oil Co.*, 76 W.Va. 769, 86 S.E. 883 (1915); *Boggess v. Milam*, 127 W.Va. 654, 34 S.E.2d 267 (1945).

[10] The plaintiffs also asserted two other claims. First, the plaintiffs asserted a claim for trespass on a different theory: that the horizontal production techniques employed by EQT were not contemplated by the parties to the 1901 lease or the parties to the 1936 severance of the surface from the mineral estate. Second, the plaintiffs alleged a claim for unjust enrichment. The circuit court did not base its judgment on either of these two claims, so we do not consider them.

7

with oil and gas leases on neighboring lands, then EQT's actions were proper. EQT further asserted that horizontal drilling is reasonable and necessary to the production of natural gas in the shale formations under the Carr Tract; accordingly, it was reasonable and necessary to extend that drilling under neighboring properties to produce natural gas from beneath those properties.

In an order dated February 19, 2016, the circuit court found as a matter of law that EQT had trespassed on the plaintiffs' surface lands, and so granted the plaintiffs' motion and denied EQT's motion. The circuit court found that EQT had the implied right to use the plaintiffs' surface lands "for well pads, roads, and pipelines to drill into, and produce gas from, but only from, the mineral tract" underlying the plaintiffs' lands. However, the circuit court found EQT had no express or implied right to enter or use the plaintiffs' surface lands to drill into and produce gas from neighboring mineral tracts. Hence, the circuit court ruled that EQT was liable to the plaintiffs for trespass.[11]

The parties proceeded to a jury trial on September 5, 2017, to determine the plaintiffs' damages on their trespass claim. After three days of trial, the jury returned a verdict awarding the plaintiffs damages against EQT. The jury awarded Mr. Wentz

---

[11] On July 6, 2017, the circuit court granted the plaintiffs' second motion for partial summary judgment, and found EQT liable to the plaintiffs for unjust enrichment. The court then required the plaintiffs to elect between seeking to recover under either their claim for trespass or their unjust enrichment claim. The plaintiffs subsequently chose to proceed under their claim for trespass and abandoned their unjust enrichment claim.

8

$180,000 and Ms. Crowder $10,000. The circuit court entered a judgment order on September 26, 2017.

Defendant EQT now appeals the circuit court's February 19, 2016, order granting partial summary judgment to the plaintiffs, and the court's September 26, 2017, judgment order.

## II. Standard of Review

EQT asserts that the circuit court erred in granting partial summary judgment and holding EQT liable to the plaintiffs for trespass as a matter of law. This Court reviews a circuit court's entry of summary judgment *de novo*. *See* Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo*."). Additionally, EQT challenges the circuit court's entry of judgment on the jury's verdict, primarily because that verdict was founded upon the court's summary judgment ruling. "Generally, findings of fact are reviewed [by this Court] for clear error and conclusions of law are reviewed *de novo*. However, ostensible findings of fact, which entail the application of law or constitute legal judgments which transcend ordinary factual determinations, must be reviewed *de novo*." Syl. Pt. 1, in part, *State ex rel. Cooper v. Caperton,* 196 W.Va. 208, 470 S.E.2d 162 (1996).

## III. Discussion

EQT argues that it is long-standing law in West Virginia that a mineral owner (or its lessee) can make any use of the surface that is "reasonably necessary" to develop

9

the minerals. Accordingly, EQT asserts that the only question the circuit court should have addressed is whether a mineral owner's (or its lessee's) use the surface of a tract to develop both the minerals below the surface and the minerals under neighboring tracts is "reasonably necessary." EQT contends that it produced substantial evidence before the trial court showing that its actions on the plaintiffs' surface lands were reasonably necessary, and that the plaintiffs failed to rebut that evidence. Accordingly, EQT argues that the circuit court's grant of summary judgment to the plaintiffs, and the jury's verdict in favor of the plaintiffs, must be reversed.

The plaintiffs, however, contend that the circuit court was correct in holding that EQT had no explicit or implicit right to use the plaintiffs' surface lands to extract minerals from neighboring tracts. In other words, the plaintiffs take the position that, as a matter of law, EQT trespassed on their surface lands to the extent it conducted operations on neighboring tracts. Furthermore, plaintiffs assert it is irrelevant whether EQT's actions were reasonably necessary to develop the minerals under neighboring tracts because EQT had no right to develop those minerals from the plaintiffs' surface lands in the first place. On this record, we agree with the plaintiffs.

This Court has defined "trespass" as "an entry on another man's ground without lawful authority, and doing some damage, however inconsiderable, to his real property." *Hark v. Mountain Fork Lumber Co.*, 127 W.Va. 586, 591-92, 34 S.E.2d 348,

10

352 (1945) (quoting 3 *Blackstone's Commentaries* 209).[12] "In every case where one man has a right to exclude another from his land, the common law encircles it, if not inclosed already, with an imaginary fence. And to break such imaginary fence, and enter the close of another, is a trespass[.]" *Haigh v. Bell*, 41 W.Va. 19, 21, 23 S.E. 666, 667 (1895) (citation omitted). "A trespasser who does so intentionally or recklessly with intent to 'take an unconscientious advantage of his victim' commits a willful or bad faith trespass and is liable for damages in a greater amount than an innocent trespasser." *Reynolds v. Pardee & Curtin Lumber Co.*, 172 W.Va. 804, 809, 310 S.E.2d 870, 876 (1983) (quoting *Pan Coal Co. v. Garland Pocahontas Coal Co.*, 97 W.Va. 368, 381, 125 S.E. 226, 231 (1924)).

The parties agree that the owner of a mineral estate has the implicit right to use the surface estate overlying the minerals, in a reasonable manner, to access and remove those minerals. "The owner of the mineral underlying land possesses as incident to this ownership the right to use the surface in such manner and with such means as would be fairly necessary for the enjoyment of the mineral estate." Syl. Pt. 1, *Squires v. Lafferty*, 95 W.Va. 307, 121 S.E. 90 (1924). The severance of a surface estate from a mineral estate "gives rise to an implied easement in the mineral owner to use the surface" because "without rights of surface use the underlying severed minerals would be worthless." Tara

---

[12] This quote was adopted by the Court as Syllabus Point 2: "An encroachment by one person on the land of another is a trespass, although the damage may be negligible." *Hark*, 127 W.Va. at 586, 34 S.E.2d at 348.

11

Righetti, *Contracting for Sustainable Surface Management*, 71 Ark. L. Rev. 367, 368-69 (2018).

Because this right of the mineral owner is implied into the parties' deed or lease, the right is limited only to uses of the surface that are demonstrably reasonable, necessary, and which can be exercised without substantial burden on the surface owner. As this Court has stated:

> [W]here implied as opposed to express rights are sought, the test of what is reasonable and necessary becomes more exacting, since the mineral owner is seeking a right that he claims not by virtue of any express language in the mineral severance deed, but by necessary implication as a correlative to those rights expressed in the deed. In order for such a claim to be successful, it must be demonstrated not only that the right is reasonably necessary for the extraction of the mineral, but also that the right can be exercised without any substantial burden to the surface owner.

*Buffalo Mining Co. v. Martin*, 165 W.Va. 10, 18, 267 S.E.2d 721, 725-26 (1980).

When a surface owner complains that the mineral owner has exceeded its implied rights, it is the duty of the court to weigh whether the mineral owner has invaded the surface owner's rights:

> In a case where there is a dispute of fact, the jury should find the facts, and from such finding of facts by the jury it is the duty of the court to determine whether the use of the surface by the owner of the minerals has exceeded the fairly necessary use thereof, and whether the owner of the minerals has invaded the rights of the surface owner, and thus exceeded the rights possessed by the owner of such minerals.

*Adkins v. United Fuel Gas Co.*, 134 W.Va. 719, 724, 61 S.E.2d 633, 636 (1950). *See also*, Syl. Pt. 2, in part, *Porter v. Mack Mfg. Co.*, 65 W.Va. 636, 64 S.E. 853 (1909) ("The owner of the surface cannot obstruct the mineral owner from a use of the surface for a tramway or other means of transportation fairly useful and necessary."); *Thornsbury v. Cabot Oil & Gas Corp.*, 231 W.Va. 676, 681–82, 749 S.E.2d 569, 574–75 (2013) ("[T]he general, common law rule in West Virginia is that a mineral owner or developer has the right to enter the overlying surface estate, but only to do that which is 'fairly necessary' or 'reasonably necessary' for the extraction of the mineral.").[13]

The plaintiffs argue that the implied right of a mineral owner to use the surface to extract the minerals in a reasonable and necessary way applies only to the minerals underneath the specific surface tract. Conversely, the plaintiffs argue that there is no implied right to use a surface tract to extract minerals from neighboring tracts. Based upon our review of the law on this question, we agree with the plaintiffs.

This Court has never had occasion to directly address the question raised by the parties. However, precedent from this Court has repeatedly noted that a mineral owner does not have an implied right to use the overlying surface lands to benefit mining or

---

[13] This right by the mineral owner to enter and use the surface is not unfettered and, in recent years, courts have emphasized that the right must be balanced against the rights of the surface owner. *See Faith United Methodist*, 231 W.Va. at 440, 745 S.E.2d at 478 (Ownership of the surface comes with "the right to use the surface for such ordinary uses as may be made thereof, with the right to use as much of the subsurface as may be necessary for the customary and ordinary uses of the surface, just as the owner of the subsurface estate has a correlative right to use the surface in order to develop the subsurface rights.").

drilling on other property. This Court has said that while a mineral owner has an implied right to necessary use of the surface, that rule "applies to the mining and production of minerals from a given tract of land, and does not contemplate the use of such tract in connection with the production of minerals from another and different tract." *King v. S. Penn Oil Co.*, 110 W.Va. 107, 110, 157 S.E. 82, 84 (1931). *See also Fisher v. W.Va. Coal & Transp. Co.*, 137 W.Va. 613, 620, 73 S.E.2d 633, 638 (1952) ("[i]n the absence of a right arising out of contract," a mineral lessee "has no right to use the surface" of a leased tract "for transporting and processing coal admittedly mined from lands adjoining" the leased tract); Syl. Pt. 7, *Armstrong v. Maryland Coal Co.*, 67 W.Va. 589, 69 S.E. 195, 196 (1910) (The purchaser of land "may not, as a condition precedent to the execution of the contract, demand as mining rights the right to remove over, through and under the lands in which the coal conveyed is situated coal thereafter acquired by the purchaser[.]"); *Findley v. Armstrong*, 23 W.Va. 113 (1883) (Seller of land could not prepare deed different from parties' contract that added right for seller "to remove on and through this tract of land the coal of coterminous tracts of land[.]").

A review of other jurisdictions shows "the contemporary position is that the mineral owner is not entitled to use the surface for the benefit of other mineral ventures without express permission." Donald N. Zillman, J. Russell Tyler, Jr., *The Common Law of Access and Surface Use in Mining*, 1 J. Min. L. & Pol'y 267, 288 (1985).[14] As one high

---

[14] *See Roberts Ranch Co. v. Exxon Corp.*, 43 F.Supp.2d 1252, 1257 (W.D. Okla. 1997) (there was neither express language in the lease nor an implied easement

giving the mineral lessee the right to free use of natural gas from the lease to operate an off-lease gas processing facility); *Farragut v. Massey*, 612 So.2d 325, 328 (Miss. 1992) ("The right of the mineral owner to use and occupy the land is restricted to operations for exploring for and extracting minerals from that land.  Thus, the land cannot be used . . . to dispose of salt water from other land."  Quoting 1 E. Kuntz, *A Treatise on the Law of Oil and Gas*, § 3.2 at 87–88 (1987)); *Delhi Gas Pipeline Corp. v. Dixon*, 737 S.W.2d 96, 98 (Tex. App. 1987) (Mineral lessee has "the right to use as much of the [surface] premises as is reasonably necessary to produce and remove the oil, gas, and other minerals," including laying pipeline; however, lessee does not "have the right to transport any other gas" in the pipeline from other properties, absent an express "easement from the owner of the surface estate."); *TDC Eng'g, Inc. v. Dunlap*, 686 S.W.2d 346, 348 (Tex. App. 1985) ("[S]ince the . . . leases cover different tracts of land, they do not give the lessee or its operator the right to dispose of salt water produced from some of the leases on land covered by a different lease."); *Robinson v. Robbins Petroleum Corp.*, 501 S.W.2d 865, 868 (Tex. 1973) ("Robinson, as owner of the surface, is entitled to protection from uses thereof, without his consent, for the benefit of owners outside of and beyond premises and terms of the Wagoner lease. . . . Robinson is entitled to recover the value of that portion of the salt water which has been consumed for the production of oil for owners of lands outside the Wagoner lease[.]"); *Tutwiler v. Etheredge*, 231 So.2d 93, 94-95 (Ala. 1970) (It was improper for owner of mineral rights to cut road across plaintiffs' land to work on adjacent tract.  "It has long been the law in this state that one who acquires mineral rights under a tract of land does not acquire thereby the right to use that land to mine adjacent land."); *Groves v. Terrace Min. Co.*, 340 S.W.2d 708, 711 (Mo. 1960) ("[T]he grant or reservation of the mineral estate, with the implied or expressly stated right to use the surface for the removal and processing of minerals taken from the land did not carry with it the right to use the surface estate for the processing of minerals obtained from other lands."); *Ross Coal Co. v. Cole*, 249 F.2d 600, 605 (4th Cir. 1957) ("Extending the implied right to operate a tipple for the removal of coal from adjacent lands would materially increase the burden upon the servient estate.  Unless the deed, itself, provided such right, it is not to be implied."); *Wise v. Tabor*, 206 P.2d 970, 972 (Okla. 1949) (The defendant had the exclusive right to the use of the surface of the land, and the oil and gas lessee's use of the surface to store oil produced elsewhere violated defendant's rights.); *Bourdieu v. Seaboard Oil Corp. of Delaware*, 100 P.2d 528, 534 (Cal. App. 1940) ("The filling of gulches and ravines on appellant's premises with oil and waste products from oil wells outside of appellant's land" was beyond the mineral lease, which gave the mineral lessee only the right to remove minerals from the appellant's land.); *Schmidt v. Schmidt*, 1 N.E.2d 419, 425 (Ill. App. Ct. 1936) ("In the absence of an express grant, we are clearly of the opinion that the right to use the surface of tract No. 1 for the purpose of hoisting, transporting, loading, and unloading the coal underlying tract No. 2 does not exist."); Syllabus Point 3, *Pure Oil Co. v. Chisholm*, 75 P.2d 464 (Okla. 1936) ("Where an oil and gas producer operates oil and gas wells upon two separate and independent properties, he may not permit salt water from one of said

15

court said, "[i]t is well settled in Kentucky, as elsewhere, that in the absence of an express agreement, the mineral owners or lessees cannot use the surface for the production of minerals from other lands." *Wiser Oil Co. v. Conley*, 346 S.W.2d 718, 722 (Ky. 1960). One of the seminal cases on this question is *Russell v. Texas Company*, 238 F.2d 636, 642 (9th Cir. 1956), where the court held:

> It is a well established principle of property law that the right to use the surface of land as an incident of the ownership of mineral rights in the land, does not carry with it the right to use the surface in aid of mining or drilling operations on other lands.

Stated simply, "[t]he mineral owner's [implied] right of surface use does not include the right to use of the surface in connection with mineral development and production from other lands, and the mineral owner will be liable in the event of such use." Steve Ruffatto, Kemp Wilson, *Scrivener's Concerns in the Creation and Transfer of Severed Mineral and*

---

properties to flow over the lands in the other property without being responsible to the owner of the second property for any damages which may result therefrom[.]"); *Moore v. Lackey Mining Co.*, 284 S.W. 415, 417 (Ky. 1926) (Unless a lease or deed authorizes it, no case stands for "the principle that the coal from adjacent lands might be brought to the surface through the pits, shafts, or entries from the surface of a given lease and its surface be used as the dumping ground of the refuse therefrom, and the structures on its surface be used in mining or loading or marketing such coal."); *Franz Corp. v. Fifer*, 295 F. 106, 108 (9th Cir. 1924) (Jury could consider awarding damages when defendant mineral lessee used plaintiff's lands to conduct "oil operations on lands adjacent to and in the vicinity of the lands belonging to plaintiff[.]"); *Dietz v. Mission Transfer Co.*, 25 P. 423, 425 (Cal. 1890) (A mineral deed's implied right to enter the surface is limited to the land described in the deed. "To hold that the defendant could enter upon, occupy, and use the land for its convenience in extracting and removing oils from another and different tract of land, would be to vary the terms of the deed in a material respect, and make for the parties a new and different contract. This the courts have no power to do.").

16

*Royalty Interests*, 9 Pub. Land L. Rev. 31, 52 (1988). As one legal commentator recently noted, when examining the law on this question in the context of horizontal drilling:

> While a surface owner has no choice but to allow a mineral owner to do what is necessary to reach the minerals *directly below* his surface, the [surface] owner should not be forced, without his consent or any additional compensation, to allow the [mineral] owner to use his land in order to reach minerals that are not directly below his surface.

Jason A. Proctor, *The Legality of Drilling Sideways: Horizontal Drilling and Its Future in West Virginia*, 115 W.Va. L. Rev. 491, 519 (2012).

Finally, scholars have also found it "a rather strict general rule that in the absence of contractual permission, the holder of the minerals underlying a tract of land will not be permitted to use the surface thereof in aid of mining operations on adjacent, adjoining, or other tracts of land." See W. C. Crais III, *Right of owner of title to or interest in minerals under one tract to use surface, or underground passages, in connection with mining other tract*, 83 A.L.R.2d 665 (1962). Scholars examining the rights of surface owners and mineral owners have consistently found that a mineral "lessee does not have the right to use the surface of the premises in aid of drilling operations on other lands." William B. Browder, *The Dominant Oil and Gas Estate – Master or Servant of the Servient Estate*, 17 Sw. L.J. 25, 46 (1963).[15] As one writer on the subject noted:

---

[15] *See*, *e.g*., Tara Righetti, *Contracting for Sustainable Surface Management*, 71 Ark. L. Rev. 367, 370-71 (2018) ("Courts have limited the uses permitted under the implied easement to those that are reasonably necessary to the extraction of the underlying minerals . . . and are not for the benefit of extra-lateral parcels."); Bruce M. Kramer, *Horizontal Drilling and Trespass: A Challenge to the Norms of Property and Tort Law*, 25

> A mineral owner or lessee may impliedly use the surface of a tract in any way reasonable to the development of the minerals underlying that tract. However, the right to use the surface of one tract for the benefit of another tract will not be implied. Such unauthorized use will constitute an "excessive user." The surface owner should prevail in enjoining the drilling operation in a trespass action or suing for damages based upon the value of the unauthorized surface use.

John D. McKinnis, *Directional Drilling, Subsurface Trespass, and Conversion*, 4 J. Min. L. & Pol'y 235, 243 (1988).

---

Colo. Nat. Res. Energy & Envtl. L. Rev. 291, 326 (2014) ("[W]hile a mineral lessee may have the right to use the surface itself or to convey the implied easement to another party, it cannot do so where the surface . . . is being used to support mineral extraction activities off of [the leasehold]. That off-tract use would clearly be an excessive use of the implied easement."); Bruce M. Kramer, *The Legal Framework for Analyzing Multiple Surface Use Issues*, 44 Rocky Mountain Min. L. Found. J. 273, 317 (2007) ("[T]he overwhelming majority of cases support the general proposition that in the absence of express language to the contrary the mineral owner can only use the surface for activities directly related to its mineral or leasehold estate."); J.E. Pool, *Use of the Surface Fee by the Mineral Operator*, 32 Miss. L.J. 104, 112-113 (1960) ("The use of the surface by the mineral operator is limited to use for the production of the minerals under the surface and does not, in the absence of special agreement such as a pooling provision in the lease, extend to production from beneath other land. This means that the operator may not drill directionally from his lessor's land into deposits in which the lessor has no interest and from the development of which the lessor derives no benefit."); Thomas Newlon Chambers, *Case Comments*, 53 W.Va. L. Rev. 72, 88 (1950) ("In the absence of an express agreement a coal lessee cannot use the *surface* owned by his grantor or lessor in producing, cleaning, marketing, or in any way handling coal produced on the lands of another. Mining privileges and rights contained in a lease or deed relate to coal to be produced from the land covered by the instrument and none other."). *But see* Lori A. Dawkins, Allison J. Farrell, Lauren K. Turner, *Surface Use in the Age of Horizontal Drilling: Will Horizontal Wells Be Considered a "Reasonably Necessary" Use of the Surface?*, 88 N.D. L. Rev. 595, 608 (2012) (Acknowledging that while "some courts have recognized that the implied easement of sur[f]ace use generally does not extend to support activities benefiting off-leasehold properties," advocating that when "either voluntary or compulsory pooling or unitization occurs," courts should not limit "the use of the surface to the mineral tract directly beneath that surface" because to do so would frustrate "progress" and the "discovery and production" of natural gas).

We therefore hold that a mineral owner or lessee has an implied right to use the surface of a tract in any way reasonable and necessary to the development of minerals underlying the tract. However, a mineral owner or lessee does not have the right to use the surface to benefit mining or drilling operations on other lands, in the absence of an express agreement with the surface owner permitting those operations. Stated differently, "Although the owner [or lessee] of the mineral estate hypothetically owns to the deepest depths of the earth, horizontally the *ad coelum* doctrine is limited to the interior of the surface boundaries from which the mineral estate is derived." Christopher S. Kulander, R. Jordan Shaw, *Comparing Subsurface Trespass Jurisprudence – Geophysical Surveying and Hydraulic Fracturing*, 46 N.M. L. Rev. 67, 73 (2016).

In the instant case, EQT asserts that the 1901 oil and gas lease gives it the explicit right to enter the plaintiffs' lands for the "purpose of mining and operating for oil and gas, and of laying pipe lines and building tanks, stations and structures thereon, to take care of said products." The 1901 lease, however, clearly has application only to the premises described in the lease: the 351-acre Carr Tract. The Carrs plainly intended for their 1901 lease to limit EQT (and its predecessors) to mining and operating for oil and gas to remove minerals beneath the surface of the Carr Tract. "[C]ourts cannot rewrite a contract or deed that plainly expresses the parties' intent," *Faith United Methodist*, 231 W.Va. at 444, 745 S.E.2d at 482, and we decline to rewrite the 1901 lease to expand EQT's rights.

19

Moreover, when the plaintiffs' surface estate was severed from the mineral estate in 1936, the surface estate was subject only to the terms of the 1901 lease. The deeds severing the surface and mineral estates contain no language altering the burden imposed on the surface under the 1901 lease, and no express language allowing the surface estate to be used in the extraction of hydrocarbons from neighboring lands. After the 1936 severance, the mineral owner and leaseholder only had the rights, explicit and implicit, to use the surface to reasonably explore for and extract minerals from the Carr Tract. We therefore also decline to rewrite the 1936 severance deed to alter EQT's rights and the surface owners' burdens.

EQT, however, contends that it modified the 1901 lease in 2011, when the current owners of the *mineral estate* signed an amendment allowing EQT to "pool" or "unitize" the Carr mineral estate with surrounding mineral tracts. EQT argues that this 2011 modification to the lease changed the rights attendant to the *surface estate*, an estate that split from the mineral estate in 1936. We reject this argument because, in 2011, the owners of the mineral estate no longer owned the right to use the surface estate for exploration on and production from neighboring tracts. Because the mineral estate was severed from the surface estate in 1936, that right belonged to the plaintiffs or, more specifically, was a right attached to their surface estate. Hence, the mineral owners could not have conveyed that right to EQT in the 2011 amendment.

We end with EQT's central argument, which is that its method of horizontally drilling wells from the plaintiffs' surface lands was reasonable and necessary

20

to develop *the natural gas beneath neighboring lands.* We reject this argument because, as the plaintiffs established, EQT had no right to be upon the Carr Tract to explore and drill for natural gas beneath neighboring lands. This Court will not imply a right to use a surface estate to conduct drilling or mining operations under neighboring lands; as noted above, the right must be expressly obtained, addressed, or reserved in the parties' deeds, leases, or other writings.

In sum, under the 1901 lease, EQT only had a right to conduct operations on the plaintiffs' surface lands to explore for and extract oil and gas from beneath the Carr Tract. EQT had neither an express agreement with the plaintiffs (or their predecessors) nor an implicit right to use the plaintiffs' surface lands to benefit its drilling operations on neighboring lands. EQT has identified no genuine issue of material fact on this question. Accordingly, the circuit court was correct to grant the plaintiffs' motion for partial summary judgment. The record supports the circuit court's finding that EQT trespassed on the plaintiffs' surface lands to the extent it used those lands to extract minerals from neighboring properties. The jury's verdict, and the court's consequent judgment order, are therefore proper.

## IV. Conclusion

Our holding today does not challenge or constrain the drilling methods chosen by the oil and gas industry. The industry has shown that horizontal drilling and hydraulic fracturing techniques are evolving at a rapid pace and are an economical and efficient tool for producing hydrocarbons. Our opinion only affirms a classical rule of

21

property jurisprudence: it is trespassing to go on someone's land without the right to do so. A mineral owner or lessee has an implicit right to use the overlying surface to access only the minerals directly below the surface. Using the surface to extract minerals elsewhere, without the permission of the surface owner, is a trespass. Should the mineral owner or lessee want to utilize the surface to access minerals under neighboring land, they can certainly reach a separate agreement with the surface owner.

A primary "aim of government is to protect property rights, insure the possession and enjoyment thereof by the owners and thus promote domestic tranquillity and the general welfare." *State v. McDowell Lodge, No. 112, A.F. & A.M.*, 96 W.Va. 611, 613, 123 S.E. 561, 563 (1924). To protect property rights, this Court's goal is to promote clear and simple rules of land ownership, and "to avoid bringing upon the people interminable confusion of land titles; instead, we must endeavor to prevent and eradicate uncertainty of such titles." *Faith United Methodist*, 231 W.Va. at 431, 745 S.E.2d at 469 (cleaned up). Our opinion merely restates a bright-line rule founded long ago in the common law that surface owners and mineral owners (or their lessees) can easily navigate.

The circuit court's February 19, 2016, partial summary judgment order and September 26, 2017, judgment order are supported by the record and must be affirmed.

Affirmed.

22